# EXHIBIT A

# CHARGE OF DISCRIMINATION

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy act statement before completing this form. | [ ] FEPA | |
| ______________________ and EEOC<br>State or local Agency, if any | [x] EEOC | |

| | | |
|---|---|---|
| NAME (Indicate Mr.. Ms., Mrs.)<br>**Ms. Shaday Nicolette Delgado**<br>**Sndelgado.24@gmail.com** | | HOME TELEPHONE (Include Area Code)<br>**(917) 507-4156** |
| STREET ADDRESS<br>**ACP 6047**<br>**PO Box 1110** | CITY. STATE AND ZIP CODE<br>**Albany, NY 1220-1110** | DATE OF BIRTH<br>**11/24/1989** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| | | |
|---|---|---|
| NAME<br>**Planned Parenthood of Greater New York, Inc.**<br>**Email: jmancebo@kaufmandolowich.com** | NUMBER OF EMPLOYEES, MEMBERS<br>**+15** | TELEPHONE (Include Area Code)<br>**(914) 688-1615** |
| STREET ADDRESS<br>**26 Bleeker St.** | CITY, STATE AND ZIPCODE<br>**New York, NY 10012** | COUNTY<br>**New York County** |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es))

| | | | | | DATE DISCRIMINATION TOOK PLACE | |
|---|---|---|---|---|---|---|
| [X] RACE | [ ] COLOR | [X] SEX | [X] RELIGION | [ ] NATIONAL ORIGIN | EARLIEST (ADEAJEPA)<br>**01/01/2019** | LATEST (ALL)<br>**06/21/2024** |
| [X] RETALIATION | | [ ] AGE | [X] DISABILITY | [ ] OTHER Pregnancy Act | [ X ] CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, al/ach extra sheet(s)

Please See Attached

[ ] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date: ~~June~~ July 1, 2024: Charging Party:

State of New York
County of New York:

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

/x/ [signature] 07/01/24
SIGNATURE OF COMPLAINANT DATE

Sworn to and subscribed to before the undersigned notary public in and for said jurisdiction this 1 day of ~~June~~ July 2024,

My commission expires: 12/27/2026

[signature]
Notary Public

EEOC Form 5 modified

LAURA BELLINI
Notary Public - State of New York
No. 02BE6445570
Qualified in New York County
My Commission Expires December 27, 2026

PHILLIPS & ASSOCIATES
*Attorneys at Law*
45 BROADWAY, SUITE 430, NEW YORK, NEW YORK 10006
TEL: (212) 248-7431 FAX: (212) 901-2107
WWW.NYCEMPLOYMENTATTORNEY.COM
*A PROFESSIONAL LIMITED LIABILITY COMPANY*

July 1, 2024

U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

**CHARGE OF DISCRIMINATION**

**RE: Our Client(s):** **Shaday Nicolette Delgado**

**Nature of Complaint:** **Sex/Gender, Race (Hispanic), Religion (Santeria), and Domestic violence victim status, Retaliation, and Constructive Discharge**

**~against~**

**Planned Parenthood of Greater New York, Inc.,**

Dear Madam/Sir:

The following is a charge of discrimination on the basis of sex/gender, race (Hispanic), religion (Santeria), and domestic violence victim status, as well as retaliation that this office is filing on behalf of Complainant, Shaday Nicolette Delgado against Respondent Planned Parenthood of Greater New York, Inc..

Complainant's address and telephone number is:

ACP 6047
PO Box 1110
Albany, NY 1220-1110
(917) 507-4156
Sndelgado.24@gmail.com

The name and address(es) of the business(es) against whom the charge is made are:

**Planned Parenthood of Greater New York, Inc.,**
26 Bleeker St.,
New York, NY 10012
Attn: John Mancebo, Kaufman Dolowich & Voluck LLP
jmancebo@kaufmandolowich.com
(914) 688-1615

The exact number of employees at the above entity is unknown, but upon information and belief, there are well more than the statutory minimum.

**A Statement of Facts is as follows:**

1. Complainant is a Hispanic female resident of the State of New York.
2. In May 2021, Complainant was baptized into the Santeria religion, and continues to practice Santeria presently.
3. At all times material, Complainant was and is a survivor of domestic violence, and has, and had, sought treatment for domestic violence related trauma.
4. At all times material, Respondent PPGNY was and is a domestic not-for-profit corporation duly incorporated under the laws of the State of New York.
5. At all times material, Respondent PPGNY is a provider of sexual and reproductive health services and information.
6. At all times material, Respondent PPGNY does and did operate their headquarters at located at 26 Bleecker Street, New York, NY 10012.
7. At all times material, Complainant is and was a hybrid employee of Respondent PPGNY, working both in headquarters and remotely.

**<u>MATERIAL FACTS</u>**

8. In January 2019, Complainant began working for Respondent PPGNY as a paid Intern. Specifically, during her internship, Complainant worked as a "Patient Escort Liaison."
9. In August 2019, Respondent PPGNY hired Complainant as an Administrative Associate in the Facilities Department. In this position, Complainant earned $24.79 per hour.
10. As an Administrative Associate in the Facilities department, Complainant was and is responsible for offering program and office support, reviewing volunteer escort feedback

forms and summarizing the content of the same, maintaining files, vetting and coordinating requests from outside agencies for use of PPGNY conference rooms, coordinating a yearly purge of records, attending safety and security meetings and taking meeting minutes, providing support for other meetings upon request, working with the human resources department and compliance department to ensure all employees complete mandatory trainings, general administrative tasks, scheduling meetings, preparing for approval purchase orders/check requests/credit card reconciliation reimbursements via software programs, ordering supplies, creating manuals/training tools/slide decks, and participating in other special projects as needed.

11. Throughout Complainant's employment, she has been an above-satisfactory employee and fully qualified to perform the duties of her employment. Complainant has not received any negative performance reviews.

12. Additionally, throughout, Complainant's employment, management, including Vice President of Facilities, Jennifer Mille, had allowed her to work a flexible hybrid schedule to accommodate her therapy appointment, domestic violence social services, and legal services. Complainant used this time to consult with attorneys, apply for social services such as safety planning and food stamps, connecting with state agencies for confidentiality services, connecting with her social worker, and going to the police station to report domestic violence related matters. Ms. Mille was aware that Complainant was using this time for these purposes.

13. In September 2019, Complainant began to experience discrimination at Respondent PPGNY based on her sex/gender, race, religion, and domestic violence victim status. The discriminatory actions have been largely perpetrated by Region 1 Facilities Manager, Rene Martinez, former Vice President for Facilities and Security, Khemraj Tiwari, and Ms. Mille.

***Gender Discrimination***

14. In 2019, Complainant offered her input in attempting to solve an issue at work, and Mr. Martinez told her that she was a "girl" and that she "didn't know what [she] was talking about."

15. Mr. Martinez also regularly made comments about what duties belonged to Complainant, because of her gender.

16. Mr. Martinez often told Complainant to "**Focus on being a receptionist and a secretary**."

17. Additionally, Mr. Martinez asked Complainant, "How is your daughter supposed to be taken care of when you're working? Who's going to take care of your daughter in the summer?" Mr. Martinez did not ask his male colleagues with children this same question.

18. In February 2020, during a conversation about building construction, Mr. Martinez mocked Complainant due to her gender, stating, "**What do *you* know**? **Now all the sudden** [**Complainant**] **knows how to paint and put sheetrock up**…**Look guys, isn't that cute of her**?"

19. About a month later, Mr. Martinez told Complainant, "You don't know what you are doing and need to focus on what you got hired for." This was a false accusation to intimidate and humiliate Complainant.

20. Additionally, throughout the year 2020, after Respondent PPGNY switched to a remote workplace due to the COVID-19 pandemic, during Tuesday team Zoom meetings, Mr. Martinez negatively commented on Complainant's appearance by saying, "Oh look she rolled out of bed and she's ready for work." Mr. Martinez did not make these same comments about their male colleagues.

21. As another example, that same year, Mr. Martinez told Complainant that she needed to "**stick to being pretty and staying on the computer**."

22. This behavior continued into 2021, when Mr. Tiwari was hired.

23. For example, in that year, Complainant told Mr. Tiwari that she attended Stonybrook College for her bachelor's degree. Mr. Tiwari responded, "**I know a thing or two about the girls from Stony Brook and how they *get down* after hours**." Complainant was uncomfortable and did not respond.

24. Mr. Tiwari also texted Complainant after work hours, late at night. This also made Complainant uncomfortable.

25. Additionally, during this time, Mr. Martinez did not stop making his own discriminatory comments to or about Complainant.

26. For example, several times in Complainant's presence, Mr. Martinez looked at the medical assistants (names currently unknown) at Respondent PPGNY and say, "**They have fat asses in their scrubs**."

27. Several times throughout Complainant's employment, Mr. Martinez told Complainant, "**Your clothes are fitting shapely**."

28. Mr. Martinez also told Complainant, "**Your ass looks fat in those leggings**. **You should wear a shirt to cover it**."

29. In April 2022, Complainant complained to Ms. Mille that Mr. Martinez was making her uncomfortable by the comments he was making about her gender, and her appearance. Instead of acting to stop Mr. Martinez' behavior, Ms. Mille said that Mr. Martinez was just being sarcastic, and that he was "playing."

30. Complainant replied, "No, he's making me uncomfortable with these comments." Once again, instead of taking Complainant's complaints seriously, Ms. Mille said, "**As a woman in Facilities, you're going to deal with these things**. **You have to grow a thick skin**."

31. Ms. Mille then told Complainant that there was a time where she (Ms. Mille) was working in the Facilities Department, and when she wore a dress to work, the men said that she could not help them because she was a girl.

32. However, despite her own experiences with discriminatory comments at Respondent PPGNY, Ms. Mille went on to say that Mr. Martinez' comments had nothing to do with gender, and that Complainant would need to talk to Mr. Martinez without the communication being hostile.

33. Because Ms. Mille did not act to stop the Mr. Martinez' discrimination and harassment, it continued.

34. In June 2022, Mr. Martinez told Complainant that the Facilities Department was "man's work," and that Complainant was hired to "be on the computer," and not give input into matters involving the Facilities Department.

35. Mr. Martinez also routinely harassed Complainant by sending her emails stating that he was "looking for," Complainant. When Complainant responded and asked him what he needed, he said, "Who is better than you? I am." Mr. Martinez said this to humiliate Complainant, and to say that he was better than her because he was a man.

36. On February 16, 2023, during a conversation with Complainant about work, Mr. Martinez began to discuss their colleague, Amberlynn (last name currently unknown). Mr. Martinez said that she (Amberlynn) was named after her father's "favorite pornstars." Complainant was offended by this sexual comment made about her coworker.

37. In May 2023, Mr. Martinez told another employee, Ramon Cruz, that Complainant was "busting his balls" when Complainant asked him for outstanding work that he had not provided to her. This comment was part of Mr. Martinez' campaign of harassing Complainant.

38. Around this time, Complainant complained again to Ms. Mille about Mr. Martinez'

inappropriate comments about her gender.

39. Once again, Ms. Mille failed to address the situation. Instead, Ms. Mille told Complainant, "**Mr. Martinez and** [Maintenance Tech] **Juan's wives are stay at home wives**, **you're Puerto Rican just like them**, **in their minds because their wives are stay at home wives and Hispanic**, **they expect you to do the same**."

40. Complainant responded, "I understand that, my dad wasn't like that for me he taught me everything I know. I'm having a hard time wrapping around my head why they think like that."

41. Ms. Mille said that she understood that, but that Complainant needed to prove to Mr. Martinez and Juan that she belonged in the Facilities Department, and that she could not have a "hostile," relationship with them.

42. These types of comments have lasted the duration of Complainant's employment with Respondent PPGNY.

***Domestic Violence Victim Discrimination***

43. Throughout Complainant's employment, Mr. Martinez and Ms. Mille regularly asked Complainant invasive questions about her domestic violence cases.

44. For example, because Complainant had to appear in court over a period of several years due to a domestic violence situation, Mr. Martinez criticized Complainant by saying she was "insane" for continuing her legal efforts against her abuser. Mr. Martinez told Complainant, "The definition of insanity is doing the same thing over and over again."

45. In July 2022, when Complainant informed Ms. Mille that she would be out to attend a court hearing related to her domestic violence issues, Ms. Mille responded with a story about a video she saw wherein a woman and her abuser lied about being in the same location during a court

hearing. **Ms. Mille laughed while telling this story, and asked Complainant if she thought it was funny**. Complainant said she did not find the video funny.

46. Additionally, while Complainant was living in a domestic violence shelter, she was storing food for herself and her daughter in a shared kitchen at the shelter.

47. On one occasion, Complainant informed Ms. Mille that the food she had stored at the shelter was being stolen, so she needed to take off work to visit the food pantry to replace it for her and her daughter.

48. When Complainant told Ms. Mille about the missing food she was storing, and the reason why she was storing it, Ms. Mille shared the information on a private text thread with managers. In this thread, the managers made fun of Complainant and her food insecurity.

49. Ms. Mille then shared the text chain with Complainant to further humiliate her. The text was from Senior Facilities and Security Manager of Region 2, Michael Friedman, who sent a meme of a Dial soap bar on a wooden popsicle stick, and the soap bar was dipped in chocolate. Mr. Friedman captioned the meme, "**This is what** [**Complainant**] **needs to do when her food gets stolen**."

***Religion and Race Discrimination***

50. Mr. Martinez also made numerous discriminatory remarks regarding Complainant's religion, Santeria, including about the spiritual beads that Complainant wears signifying her religion.

51. For example, in June 2022, Mr. Martinez mocked Complainant regarding her religious beads by saying, "**What are those things you have around your neck, you're not going to send me spirits, are you**?"

52. In August 2022, Mr. Matinez commented to others in the office, "**[Complainant] practices Voodoo everyone**, **watch out now**."

53. In June 2023, Mr. Martinez told Complainant to "rub her religious beads" on the clothing of an employee in the mail room so the employee could have "something bad happen to her" and "quit the job."

54. In July 2023, Security Guard, Larry Funches, asked Complainant about her beads, and implied that she was a member of the Latin Kings because of her beads. Complainant replied that she had not joined a gang, but that she was baptized into Santeria and the beads were important to her religion.

55. Mr. Martinez continued his discriminatory remarks towards Complainant's religion in the presence of other co-workers, and said, "**I get it you do practice Voodoo**." When Mr. Martinez made this comment, he and Mr. Funches, as well as Security Guards, Oscar Nyola, and Colin Brown, laughed at Complainant.

56. After this incident, Complainant told Mr. Martinez that if the discriminatory comments did not stop, she was going to report him to Human Resources (HR) and her Union, Local 1199.

***Retaliation***

57. In July 2023, Complainant told Ms. Mille that there was a problem with the way invoices were being processed, due to the way that Mr. Martinez had given the assignment. Mr. Martinez had assigned the invoices to Mail Clerk, Tiffany Abbott, without giving her instructions on how to handle the task.

58. Ms. Abbott also had a pending grievance against Mr. Martinez. As such, Complainant reasonably believed that Mr. Martinez was handling the invoices in a problematic way in order to retaliate against both her and Ms. Abbott.

59. Complainant explained to Ms. Mille, "The situation with [Mr. Martinez] is out of hand. He's causing confusion in my work and [Ms. Abbott]'s work. I don't know if it's malicious intent

or you spoke to him. I did inform Mr. Martinez that if this continues, I'd report to HR and the Union."

60. Instead of investigating Complainant's claims of retaliation, Ms. Mille shamed Complainant by saying, "**We in Facilities don't go to HR**. You threatened [Mr. Martinez] by telling him you would go to HR and the Union. I'm disappointed in you and in the fashion that you handled this."

61. After learning that Ms. Mille would not help her, Complainant reported Mr. Martinez' behavior to Representatives from Respondent PPGNY's Diversity, Equity, and Inclusion department, Naomi Cunningham and Pamela Davis. During the conversation, Complainant explained that she experienced microaggressions and inappropriate comments from Mr. Martinez and others in the Facilities Department.

62. At this time, Complainant also made a complaint to her Union representative, Eunia Lantinwo, about the discrimination she was experiencing due to her gender, religion, and status as a domestic violence survivor.

63. Further, around this time, Complainant also formally complained to Respondent PPGNY's Assistant VP of HR, Christopher Gonzalez. Complainant reported the comments made by Mr. Martinez, and told Mr. Gonzalez that Ms. Mille failed to act to stop the discrimination.

64. Following this conversation, Complainant was never notified about the status of any investigation into her complaints of discrimination.

65. On September 11, 2023, Complainant noticed that HR had accessed her computer remotely. While Complainant was using the computer, he mouse started moving on the screen without her manipulating it and began checking her search history.

66. On September 28, 2023, Complainant met with Mr. Gonzalez again, along with HR Generalist,

Maggie Cavanaugh, and Union Organizer, Priscilla Pena, to discuss her complaints. During this meeting, Complainant repeated the complaints that she had against Mr. Martinez and Ms. Mille. Complainant also provided Ms. Cavanaugh and Ms. Pena with documentation that reflected her experiences with Mr. Martinez and Ms. Mille.

67. In total, Complainant provided three (3) journals that included comments to Ms. Cavanaugh documenting discriminatory comments, as well as details documenting how she was repeatedly asked to work outside of her title.

68. Upon collecting the documentation, Ms. Cavanaugh told Complainant that she would "get back to her."

69. However, to date, Complainant is not aware of any investigation into her complaints of discrimination.

70. Following Complainant's complaints, Respondent PPGNY continued to direct Complainant to perform duties outside of her job description without additional compensation.

71. Specifically, Complainant was only supposed to work as an administrator for five (5) locations, but had been performing work for all twenty-four (24) locations.

72. Complainant was also assigned to do interviews and participate in the interview process, even though this was supposed to be a function of HR. Complainant was tasked to ask the diversity and equity questions for interviews, which Complainant believed was given to her because of her race (Hispanic).

73. This workload was placed on Complainant by Ms. Mille, to cause Complainant to burn out and/or force her to quit.

74. In the alternative, Ms. Mille increased Complainant's workload to such a degree that she could not reasonably perform successfully.

75. Ms. Mille also knowingly assigned this work to Complainant while she was going through court appearances related to her domestic violence situation.

76. Complainant reported this retaliation to HR.

77. In October 2023, as a part of union negotiations, Respondent PPGNY increased Complainant's hourly wage to $26.88, and then to $28.77.

78. In November 2023, Mr. Gonzalez told Complainant that she had sent "too many emails," related to her allegations of discrimination, despite members of the HR department asking her to send proof of her claims.

79. Despite Complainant's repeated complaints, the retaliation continued.

80. For example, on or about December 18, 2023, Complainant's daughter fell ill. At some point while taking care of her daughter, Complainant got sick as well.

81. Ms. Mille was aware that Complainant's daughter was sick because Complainant had to care for her on December 18, 2023. Complainant had previously notified Ms. Mille about her daughter's illness by providing a doctor's note.

82. On December 21, 2023, Complainant sent a text to Ms. Mille at 6:38 a.m., before her scheduled shift, and again at 8:40 a.m. to inform her that she would not be able to make it to work due to her own illness. Complainant also sent Ms. Mille a doctor's note excusing Complainant from work on December 21, 2023, and December 22, 2023, due to her illness.

83. Despite Complainant keeping in regular communication with Ms. Mille about her illness, Respondent PPGNY falsely accused Complainant of a "no call, no show," or failing to call out of work.

84. Ms. Pena informed Complainant that Mr. Gonzalez had accused her of the "no call, no show," for failing to show up to the meeting on the day she called out sick. In response, Complainant

sent Ms. Pena the text messages between her and Ms. Mille regarding the call out, as well as the copayment receipt from her doctor's appointment, and a doctor's note.

85. As another example, on December 27, 2024, Complainant experienced an issue with her laptop charging while she was working from home. Complainant immediately input a "ticket," to IT regarding the issues.

86. Complainant reported the issue to Mr. Gonzalez. Mr. Gonzalez told Complainant that "nothing could be done," about her laptop, and that if she was unable to work that day due to technology issues, that she either needed to use paid time off, or report to the office.

87. Ms. Mille was aware and previously agreed that Complainant would be working from home while her daughter was on a school break (between Christmas and New Years Day). On prior occasions, if there was an issue with a laptop or electronic device for a hybrid worker, Respondent PPGNY would send a replacement charger or device via FedEx. Respondent PPGNY intentionally used this laptop malfunction as an opportunity to retaliate against Complainant, and force her to drain her paid time off bank.

***Further Retaliation and Failure to Accommodate Complainant as a Domestic Violence Survivor***

88. While Complainant was out of work taking care of her daughter, on December 20, 2023, Complainant's Union advocated for her to have a change in salary to reflect the work she was doing, a change in job title, and awarded retroactive pay to Complainant.

89. In her new role, Complainant was an Administrative Coordinator, making $31.47 per hour, or $61,360.00 per year.

90. When Complainant was first offered the title and pay change, she was not required to change her schedule.

91. However, in February 2024, Mr. Gonzalez emailed Complainant to confirm her retroactive

pay, as well as her new job title. Complainant saw that the written offer came with a decrease in hours to only twenty-two (22) hours per week. As a result, Complainant complained to the Union again, and asked why her hours were cut.

92. To resolve this issue, Respondent PPGNY presented the offer to Complainant for a third time, scheduled to go into effect on April 29, 2024. This time, however, in order to obtain the job title and pay, Complainant would need to work a different schedule than what she was working prior to her change in title, and the complaints she made against management.

93. Complainant was now required to work 8:30 a.m. to 5:00 p.m. Monday through Friday, instead of the flexible hours she had been previously working due to the need to attend to her domestic violence related proceedings.

94. Respondent PPGNY knew that this new scheduled would not allow Complainant the ability to attend her therapy appointments, pick up her daughter from school as needed as a single parent, and would not allow Complainant to attend court as needed for her ongoing cases related to her domestic violence matters.

95. Respondent PPGNY changed Complainant's schedule in retaliation for her complaints against Ms. Mille and Mr. Martinez, in an effort to force Complainant to resign.

96. On April 24, 2024, Complainant attending a grievance hearing, where she was told by Mr. Gonzalez that she would need to report to the office three (3) days per week, and that in order to attend to her appointments, that she would need to use PTO or apply for FMLA-related leave.

97. Complainant's Union representative, Ms. Lantinwo, acknowledged that, due to the frequency of Complainant's therapy appointments, appointments for social services, as well as her obligations to the Court for her domestic violence related cases, Complainant would likely

drain her PTO quickly, and that Complainant's FMLA would be unpaid, so that she would need to be accommodated otherwise.

98. Ms. Lantinwo also stated that this change in Complainant's schedule could be viewed as retaliatory.

99. Complainant also explained that she felt unsafe working from the office with that frequency, as the commute to and from the office could increase her chance of her abusers being able to locate her.

100. During this call, Complainant emphasized that could not report to work on Fridays from 8:30 a.m. to 5:30 p.m., and requested again that she be able to work the hours that she had been working from 5:00 p.m. to 7:00 p.m.

101. Mr. Gonzalez told Complainant that she was not permitted to work from 5:00 p.m. to 7:00 p.m.

102. Complainant notified management that she had appointments on the following Fridays, and would not be able to attend work at the new hours.

103. On April 26, 2024, Complainant requested the forms to apply for intermittent FMLA from Ms. Lantinwo and Ms. Pena, and Ms. Lantinwo and Ms. Pena requested the forms from Respondent PPGNY.

104. That day, due to Mr. Gonzalez' instruction not to report to work from 5:00 p.m. to 7:00 p.m., and after Complainant informed management that she would not be able to work 8:30 a.m. to 5:30 p.m. on Fridays, she did not attend work to instead attend her therapy appointments. Complainant reasonably believed she put management on notice of this in the prior calls about the schedule.

105. However, Complainant is still required to report to work using the new schedule.

106. On May 1, 2024, Complainant requested paperwork again related to requesting intermittent FMLA leave. Respondent PPGNY has not provided that requested paperwork to Complainant in order to accommodate her absences related to therapy and her domestic violence cases.

107. On May 3, 2024, Complainant once again did not attend work to instead attend her therapy appointments, because she had put management on notice of her appointment in prior calls.

108. Complainant did not clock into work from 5:00 p.m. to 7:00 p.m. as usual, because she was afraid of being written up by Mr. Gonzalez.

109. On May 6, 2024, the Senior Benefits manager at Respondent PPGNY contacted Complainant to go over the FMLA policy as well as the Safe and Sick Leave policy, and scheduled a meeting for May 8, 2024.

110. However, in further retaliation, on May 7, 2024, Complainant was issued discipline for a "no call/no show," for not calling out for her therapy appointment on May 3, 2024, despite having previously informed management during the April 24, 2024, meeting regarding her schedule.

111. On or about June 3, 2024, Complainant submitted FMLA paperwork completed by her therapist to Respondent PPGNY.

112. As a result, Respondent PPGNY only approved Complainant for FMLA for one (1) hour each Friday.

113. However, Respondent PPGNY still refused to accommodate Complainant's schedule for appointments and obligations related to her domestic violence matter.

114. As a result, Complainant continued to use her PTO as instructed by Respondent PPGNY. Due to the nature and frequency of these appointments, Complainant was forced to drain her PTO.

115. On or about June 23, 2024, Complainant needed to attend to an appointment related to her domestic violence related matter. As a result, Complainant needed to call out of work.

116. Complainant sent an email to Ms. Mille the night before her scheduled shift seeking clarity on how to input a time off request due to the need to attend to this appointment.

117. In response, and in retaliation for Complainant requesting an accommodation to attend to her domestic violence related matter, Ms. Mille responded:

> I just wanted to follow up on my previous email and remind you of our attendance policy, which requires employees to notify their supervisors of an unscheduled absence at least two hours prior to the shift's start or at the earliest possible opportunity, include their expected timeline for returning to work.
>
> Regarding your timecard and PTO balance, as per our attendance policy, all employees are expected to maintain regular and reliable attendance. Our policy allows employees to go into a negative PTO balance up to a capped limit which is -37.5. Once this limit is reached, additional time off will not be permitted unless explicitly approved by HR. This likely explains the error you encountered at ADP when trying to request more PTO.
>
> Our attendance policy also outlines the steps for progressive discipline in case of frequent or unexcused absences, late arrivals, or early departures. More than two occurrences of late arrival or early departure in a single pay period may result in progressive disciplinary action, which can include:
>
> 1. **1st Occurrence**: Verbal Warning
> 2. **2nd Occurrence**: Written Warning
> 3. **3rd Occurrence**: Final Written Warning
> 4. **4th Occurrence**: Termination
>
> Given your situation and the lack of available PTO, I recommend the following steps:
>
> 1. **Contact HR**: Reach out to HR for guidance on how to manage your current situation and explore any possible solutions or accommodations.
> 2. **Document Your Situation**: Keep detailed records of your emergencies and communications with HR for reference.

118. After receiving this email, Complainant could not longer tolerate the treatment she had received from Respondent PPGNY.

119. On or about June 25, 2024, Complainant wrote an email to Ms. Mille, and HR Representatives Eddyris Vasquez and Maggie Cavanaugh that stated:

> I hope this email finds you well. I am writing regarding my decision to resign from the organization effective immediately. Over the years of being employed at [Respondent] PPGNY, I have learned a lot at this organization that will carry on with me throughout my career. Simultaneously, while gaining experience in my roles, I have faced many toxic situations and events in the workplace and throughout my employment that I would have rather not; this leads to my resignation today. I tried to find the courage and strength to fight through the adversities I have faced while being an employee, but it began and continues to take a toll on me, exacerbating my mental illnesses and causing injury to my physical health. Optimistically, I reach out to the outlets that would assist me with these matters but to no avail.
>
> With the current climate of our ever-changing environment, I need all the courage and strength that I have, to take on the obstacles that come with the day to day life not to manage the overwhelming stress from my workday or a hostile work environment. Being a Domestic Violence victim has taught me resilience. I am sure that my next career endeavor will be a great one and with that I leave you with these words.
>
> Thank you for the employment opportunity you endowed me with for the almost near 5 years. Time will only tell all the wonderful thing this organization will do as [Respondent] PPGNY has done some pretty remarkable things. My hope is that with all the changes being implemented, [Respondent] PPGNY will be able to continue to serve the underserved communities needing sexual reproductive healthcare services free from judgment for years to come.

120. On June 25, 2024, Complainant was constructively discharged from her position at Respondent PPGNY.

121. As a result of Respondent's actions, Complainant feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

122. Complainant no longer feels safe at work, and Respondent's discriminatory conduct has exacerbated her anxiety and mental illness. Complainant has been experiencing migraines.

123. As a result of the acts and conduct complained of herein, Complainant has suffered a loss

of income, the loss of a salary, bonus, benefits, and other compensation which employment entails. Complainant has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Complainant has further experienced severe emotional and physical distress.

124. Respondent's conduct was malicious, willful, outrageous, and conducted with full knowledge of the law, and/or violation thereof.

**Phillips & Associates, P.L.L.C.**
Attorneys for Complainant

By: ______________________
Laura E. Bellini, Esq.
45 Broadway, Suite 430
New York, NY 10006
lbellini@tpglaws.com
212-248-7431