# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

Case No.: 26-cv-3504

SHADAY DELGADO,

Plaintiff,

-against-

PLANNED PARENTHOOD OF GREATER NEW YORK, INC.,

Defendant.
---------------------------------------------------------------X

**PLAINTIFF'S AFFIRMATION IN SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION**

Shaday Delgado, hereby affirms the following, under the penalty of perjury:

1. I am a Puerto Rican/Hispanic female resident of the State of New York, County of Kings, over the age of 18, and am the Plaintiff in this matter.
2. I was baptized into the Santeria religion in May 2021, and I continue to practice Santeria today.
3. I am a survivor of domestic violence and have continuously sought treatment for domestic violence related trauma since 2013.
4. I have been diagnosed with, and currently suffer from, complex Posttraumatic Stress Disorder, Major Depressive Disorder, and Generalized Anxiety.
5. Around January 2019, I began working for Defendant Planned Parenthood of Greater New York, Inc. ("Planned Parenthood") as a paid Intern at its 26 Bleecker St., New York, NY 10012 location.
6. Around August 2019, I was hired by Defendant Planned Parenthood as an Administrative Associate in the Facilities Department and earned $24.79 per hour.
7. Because I am a survivor of domestic violence, and suffer from PTSD, Major Depressive Disorder, and Generalized Anxiety, Vice President of Facilities, Jennifer Mille, allowed me to work a "flexible hybrid schedule," which allowed me to arrive late and/or work remotely when

I was dealing with domestic violence issues. This included my need to speak with attorneys, apply for social services, and/or go to the police station.

8. It also meant that I had Friday mornings off to attend therapy sessions for my mental health disabilities.

9. Throughout my employment, I regularly worked remotely on Mondays and Wednesdays from 8:30 A.M. to 1:30 P.M., signed off due to my childcare responsibilities, and logged back on from 5:00 P.M. to 7:30 P.M. On Tuesdays and Thursdays, I worked on-site from 8:30 A.M. to 1:30 P.M., left due to my childcare responsibilities, and logged back on from my residence, from 5:00 P.M. to 7:00 P.M. Finally, on Fridays, I attended mental health therapy sessions, as well as cared for my daughter, and only worked remotely from 5:00 P.M. to 7:00 P.M.

10. As a result, I typically worked about 31 hours per week.

11. Around September 2019, I began to experience discrimination based on my sex/gender, race, religion, disability and/or perceived disability, and domestic violence victim status.

12. On a consistent basis throughout my employment, I was referred to by Management as "Girl" and told, "You don't know what you're talking about."

13. At the same time, on a regular and consistent basis, Region 1 Facilities Manager, Rene Martinez, made gender-stereotyped comments to me such as, "Just focus on being a receptionist and Secretary."

14. Around February 2020, during a conversation about building construction, Mr. Martinez mocked me due to my gender and stated, "What do *you* know? Now all the sudden [Plaintiff] knows how to paint and put sheetrock up … Look guys, isn't that cute of her?"

15. Then, after the COVID-19 pandemic began, Defendant Planned Parenthood switched to full-time remote work and Mr. Martinez started making comments about my appearance during Zoom calls.

16. Specifically, Mr. Martinez routinely made fun of how I looked on camera and said that it looked like I "rolled out of bed" and was not ready to work. I never heard Mr. Martinez make such comments about my male coworkers.

17. On another occasion, around 2020, Mr. Martinez told me that I needed to "Stick to being pretty and staying on the computer."

18. Then, around 2021, Defendant Planned Parenthood hired Khemraj Tiwari as its Vice President for Facilities and Security.

19. In 2021, I told Mr. Tiwari that I attended Stonybrook University for my Bachelor's Degree, and he responded, "I know a thing or two about the girls from Stony Brook and how they *get down* after hours." I was uncomfortable and did not respond.

20. Around the same time, and on several occasions, Mr. Martinez told me that the Medical Assistants had "Fat asses in their scrubs."

21. Similarly, Mr. Martinez routinely told me that I looked "Shapely" in my clothing and said, "Your ass looks fat."

22. Eventually, around April 2022, I complained to VP of Facilities, Jennifer Mille, that Mr. Martinez made me uncomfortable because he regularly made comments about my appearance and gender. Ms. Mille dismissed my complaints and said, "[Mr. Martinez] is just playing." I replied, "No, he's making me uncomfortable with these comments." Ms. Mille replied, "As a woman in Facilities, you're going to deal with these things. You have to grow a thick skin."

23. Later, during the same conversation, Ms. Mille explained that when she first started working in the Facilities Department, her male coworkers told her that if she wore a dress that she could not work because she was a girl. Eventually, the meeting ended when Ms. Mille told me that I would have to speak with Mr. Martinez if I was uncomfortable.

24. Then, around June 2022, Mr. Martinez told me, "The Facilities Department is man's work" and that I was only hired to be on a computer.

25. On other occasions, Mr. Martinez emailed me, "Where are you?" when I stepped away from my desk. When I returned to my desk and replied asking what he needed, Mr. Martinez regularly replied that he was "Better" than me.

26. Despite my complaint to Ms. Mille, Mr. Martinez' sexual comments continued.

27. To that end, on February 16, 2023, Mr. Martinez told me that my coworker, Amberlynn (last name currently unknown), must have been named after her father's "Favorite porn star."

28. On other occasions, Mr. Martinez told me, "Stop busting my balls."

29. Around May 2023, I again complained to Ms. Mille about Mr. Martinez' harassment. Ms. Mille told me, "[Maintenance Tech] Juan (last name currently unknown) and Mr. Martinez' wives are stay at home wives, you're Puerto Rican just like them, in their minds because their wives are stay at home wives and Hispanic, they expect you to do the same." I objected and said, "I'm having a hard time wrapping around my head why they think like that." Ms. Mille then put the onus on me and said that I needed to prove to Mr. Martinez that I "belonged" in the Facilities Department.

30. Despite my complaints, the pervasive sex/gender comments continued.

31. In fact, around December 2023, Mr. Martinez told my coworkers in the Facilities Department to ignore me because I'm a woman.

32. The above are just a few examples of the pervasive sex/gender comments I experienced.

33. In addition to the sex/gender discrimination and harassment I received, I was also discriminated against because of my status as a domestic violence survivor.

34. For example, Mr. Martinez regularly told me that I was "Crazy" for continuing my legal efforts against my abuser.

35. Additionally, Ms. Mille shared with some of Defendant Planned Parenthood's other Managers that I was living in a domestic violence shelter and that food I had stored for myself, as well as my daughter, had been stolen.

36. Then, around 2023, Ms. Mille showed me a text message that she had received from Senior Facilities and Security Manager of Region 2, Michael Friedman, of a bar of soap dipped in chocolate with the message, "This is what [Plaintiff] needs to do when her food gets stolen."

37. Mr. Friedman was mocking me for having food stolen while living in a domestic violence shelter.

38. Additionally, Mr. Martinez also made numerous discriminatory remarks regarding my religion (Santeria), as well as the elekes and ildes I wore.

39. Around June 2022, Mr. Martinez asked, "What are those things you have around your neck, you're not going to send me spirits, are you?" I replied, "I was baptized in Santeria and these are my necklaces."

40. On another occasion, around August 2022, Mr. Matinez told coworkers, in my presence, "[Plaintiff] practices Voodoo everyone, watch out now."

41. Then, around June 2023, Mr. Martinez told me to rub my "Religious beads" on the clothing of a mail room employee so that something bad would happen to the employee.

42. Moreover, Mr. Martinez regularly said that I practiced "Voodoo."

43. I reasonably believed that Mr. Martinez' offensive comments referred both to my practice of Santeria, as well as my Puerto Rican racial background, as Santeria is widely practice in Puerto Rico.

44. Around July 2023, Mr. Martinez instructed Mail Clerk, Tiffany Abbott, to process some of Defendant Planned Parenthood's invoices. However, Ms. Abbott had not been trained to properly handle this task because it was outside of her regular work duties.

45. Even so, Mr. Martinez blamed me for Ms. Abbott's mistakes and said, "You don't know how to do your job."

46. As a result, around July 2023, I complained to Ms. Mille that Mr. Martinez was purposefully making my job more difficult and, "The situation with [Mr. Martinez] is out of hand. He's causing confusion in my work. I don't know if it's malicious intent or if you spoke to him (about my May 2023 complaints of harassment and discrimination). I did inform Mr. Martinez that if this continues, I'd report to HR and the Union." Ms. Mille replied, "We in Facilities don't go to HR. You threatened [Mr. Martinez] by telling him you would go to HR and the Union. I'm disappointed in you and in the fashion that you handled this."

47. I was blindsided by Ms. Mille's dismissal of my complaints and decided to report Mr. Martinez to HR.

48. Accordingly, shortly after the conversation with Ms. Mille, I reported Mr. Martinez' ongoing discrimination against my sex/gender to HR Representatives, Naomi Cunningham and Pamela Davis.

49. Around this time, I also complained to my Union representative, Eunia Lantinwo, about the discrimination I was experiencing.

50. I also complained to Assistant VP of HR, Christopher Gonzalez, "[Mr. Martinez] is derogatory towards me because I am a woman and telling me I can't do my job. [Mr. Martinez] also made inappropriate comments about medical assistants saying that they have 'big butts' and talked about sex." Mr. Gonzalez said that Defendant Planned Parenthood would investigate my complaints.

51. Nevertheless, I was not interviewed or made aware of Defendant Planned Parenthood's "investigation."

52. However, on September 28, 2023, I met with Mr. Gonzalez, HR Generalist, Maggie Cavanaugh, and Union Organizer, Priscilla Pena, to discuss my complaints. During this meeting, I repeated the complaints that I had against Mr. Martinez and Ms. Mille. Ms. Cavanaugh told me, "I'll get back to you about this."

53. Then, Ms. Mille began to assign me work outside of my regular responsibilities. In fact, she increased the number of locations for which I performed work from five to twenty-four and required me to join interviews with prospective employees to ask "diversity and equity" based questions.

54. I believe Ms. Mille assigned me these additional tasks to make my workplace so unbearable that I resigned.

55. Around Fall 2023, I emailed the HR department, Ms. Pena, as well as Ms. Lantinwo, and reported Ms. Mille's assignment of work outside of my work responsibilities.

56. Around November 2023, Mr. Gonzalez told me that I had sent "too many emails," related to my allegations of discrimination.

57. Despite my repeated complaints, the retaliation continued.

58. To that end, on December 21, 2023, I text messaged Ms. Mille at 6:38 A.M., and again at 8:40 A.M. (because I did not receive a response to my earlier text message), to request a sick day. I also sent Ms. Mille a doctor's note excusing me from work on December 21, 2023 and December 22, 2023.

59. Nevertheless, Ms. Pena accused me of being a "no call, no show" on December 21, 2023. I provided Ms. Pena with screenshots of my text messages with Ms. Mille, and the "no call, no show" was rescinded.

60. Similarly, on December 27, 2023, I was approved to work remotely because my daughter was out of school on Christmas break, when my laptop charger stopped working.

61. I immediately submitted a "ticket" to the IT Department and informed Mr. Gonzalez of my technical difficulties. In direct contrast with the typical practice of sending a replacement charger, Mr. Gonzalez said, "There's nothing we can do" and said that I needed to take PTO until I could return to the office in-person.

62. For the year 2023, I earned $45,785.88.

63. Around February 2024, I received an offer letter from Defendant Planned Parenthood to change my title to Administrative Coordinator and increase my rate of pay to $31.47. However, although not communicated to me in December 2023 when I accepted the title change, I learned from the offer letter that my hours would be cut to twenty-two per week, which would have made this a pay decrease.

64. In fact, my yearly wages would have gone down to $36,001.68.

65. As a result, I again complained to my Union about the ongoing harassment, discrimination, and retaliation.

66. To resolve this issue, Defendant Planned Parenthood offered me the change in title and pay but only if my work schedule changed from 8:30 A.M. to 5 P.M. Monday through Friday. However, Defendant Planned Parenthood was aware that I could not work that schedule because of my long standing reasonable accommodations due to my familial status, survivor of domestic violence status, and disabilities.

67. On April 24, 2024, I had a grievance call with Mr. Gonzalez and a union representative, during which I was told that I would need to report to the office three (3) days per week, and that in order to attend to my domestic violence appointments/mental health therapy sessions, that I would need to use PTO or apply for FMLA-related leave. Ms. Lantinwo said that I would quickly drain my PTO and would need to be accommodated in a different way since FMLA leave is unpaid. I also explained that I felt unsafe working from the office with that frequency, as the commute to and from the office would increase the chances of my abuser locating me, as well as the fact that I had long standing mental health appointments on Fridays.

68. During this call, I emphasized that I could not report to work in-person on Fridays because of my longstanding mental health therapy sessions, and requested again that I be allowed to work the same schedule that I had been. Mr. Gonzalez denied my request.

69. Then, on April 26, 2024, I asked Ms. Lantinwo and Ms. Pena to request FMLA paperwork from Defendant Planned Parenthood on my behalf, which they did.

70. That day, I did not attend work because Mr. Gonzalez had previously informed me that the 5 PM to 7 PM Friday schedule could not be granted anymore. Also, I had told Defendant Planned Parenthood that I would not be able to work from 8:30 AM to 5:30 PM because of my long standing mental health therapy appointment, for fear that my abuser would be able to locate me, and because of my disabilities.

71. I reasonably believed that I put management on notice of my absence from work on April 26, 2024.

72. On May 1, 2024, I requested paperwork from Senior Benefits Coordinator, Gladys Atiles, concerning intermittent FMLA leave. Ms. Atiles did not respond.

73. That same day, I attended another grievance call with Mr. Gonzalez, Ms. Mille, Ms. Pena, and Ms. Lantinwo, during which I again explained that I would not be able to work the new work schedule on May 3, 2024 because of my longstanding mental health appointments and requested that I be allowed to work the same schedule that I had been.

74. Accordingly, on May 3, 2024, I once again attended my documented mental health therapy appointments and missed work.

75. On May 6, 2024, I spoke with Ms. Atiles, and was finally provided with information about the FMLA even though it had been initially requested on April 26, 2024 and May 1, 2024.

76. Then, on May 7, 2024, I was disciplined for an alleged "no call/no show" on May 3, 2024.

77. On June 3, 2024, I requested intermittent FMLA leave for my mental health, as needed.

78. That same day, my specific request for intermittent FMLA leave as needed was denied and it was only approved for one hour every Friday.

79. However, I could not attend my therapy appointment and return to work within one hour because of my documented disabilities.

80. Around mid-June 2024, Defendant Planned Parenthood continued to refuse to accommodate my need for FMLA leave related to my disabilities, as well as status as a domestic violence survivor, and as a result, I continued to use PTO.

81. Then, on June 23, 2024, I asked Ms. Mille how I could request PTO for the following day because I had an appointment with Social Services to review a "domestic violence safety plan."

Ms. Mille responded by outlining Defendant Planned Parenthood's attendance policy and noted that I could be disciplined if my attendance did not improve.

82. I reasonably believed that Ms. Mille was making a thinly veiled threat of discipline if I continued to utilize my FMLA leave and accommodations.

83. As a result, on June 25, 2024, I emailed Ms. Mille, HR Representatives, Eddyris Vasquez, as well as Ms. Cavanaugh, resigned my employment, and wrote, "I tried to find the courage and strength to fight through the adversities I have faced while being an employee, but it began and continues to take a toll on me, exacerbating my mental illnesses and causing injury to my physical health."

84. On June 25, 2024, I was constructively discharged from my position at Defendant Planned Parenthood.

85. I believe that I was harassed because of my sex/gender, actual and/or perceived disabilities, domestic violence victim status, race, and religion.

86. I believe that I was retaliated against for my complaints of discrimination, my requests for reasonable accommodation, as well as for my intent to use FMLA-protected leave.

Dated: August 14, 2026
New York, NY

Shaday Delgado

Sworn to me this
14th day of August, 2026

JESSICA ROSALES
Notary Public, State of New York
Reg. No. 02RO0030625
Qualified in New York County
Commission Expires 11/05/2028

Notary Public